May it please the Court, Joan Levy appearing on behalf of the appellant, Quentin Jackson. Could you answer one question that may not be very important, but it puzzles me. I read the transcript of the Ferretta hearing or the Ferretta discussion. The defendant had an interpreter, and the Court asked the interpreter, is it possible for the defendant to represent himself to speak? And they said, it's possible he speaks in a very strange, slow manner. It's very difficult to understand, and I'm not sure, I wasn't sure whether that meant that the difficult for the interpreter to follow or not. And then the impression I have from reading that is that he can't hear and that he can't speak. And then when it comes to the bank robberies, he seems to be speaking and hearing perfectly normally. That's one of the points that I wanted to raise. I don't know, I don't know that on the record it was ever proven or, you know, established medically that he cannot speak, but he held himself out as someone who didn't speak. And as I was not counsel below, I have no personal knowledge one way or the other.  And I'm not sure that the court had ever considered, and from early on in the case, he needed an American sign language interpreter to communicate. And it's my understanding from reading the transcripts that in the in-camera hearing when the Court was questioning the interpreter, that she did say that it was slow, that it was a tedious, you know, process, but that he could communicate through her, that she could understand him and that she felt that she was able to communicate from him to the court or to a jury. I think her concern might have been whether he fully understood the ramifications, but in terms of the actual translation, as if it were a Spanish language or a French language interpreter, I think she felt that she could represent the words that he was saying and vice versa. As I said, it doesn't seem to be an issue in the case, but it was puzzling because It was not brought up by the defense attorney, but it's certainly one of the points that I have in my outline that I was going to address today in terms of the, actually, the second issue of identification, the fact that here we have this person who holds himself out as deaf-mute being identified as a bank robber who goes in and says, you know, give me your money, lay down on the floor, and so on. But there's no challenge to several of the counts. No. The severability, you mean, of the counts? No, several of the charges, several of the counts in which he was convicted. There's no challenge. In the record below? No, on appeal. Well, on appeal, I raise it as a sub-issue or as a fact to show poor identification. In other words, they're identifying a man and one of the characteristics is his voice and the things he's saying, and, you know, what I'm saying is, well, we have this man who is deaf, who uses a sign language interpreter. Isn't that a factor in the identification? You're challenging the sufficiency of the evidence on all the charges. Correct. But I prefer to stay on the Feretta issue because I think, quite honestly, that's the more important issue in this case. And I'd be happy to address sufficiency if the Court has any questions about that and maybe to just stress the sufficiency in counts 4 and 5. But I believe that because the Feretta issue, you know, falls directly under the Sixth Amendment guarantee to counsel and then vice versa, the defendant's right to waive his right to counsel and defend himself, that this is the issue that has to be addressed today, because what we need to look at today is, you know, Feretta says you can waive a right as long as your waiver is knowing and intelligent. And prior to 2008, the test for, you know, for this determination of self-representation was the Godinez v. Moran case where it was found that the competency standard for waiving counsel was the same competency standard for standing trial. And Jackson had been found mentally competent by a psychiatrist to stand trial. Now, the new test, Indiana v. Edwards, that decision wasn't made until about 10 months after the this in-camera hearing on Jackson. And what Indiana v. Edwards does is it carves out an incompetency exception to the Feretta right for severe mental illness. And, you know, I place the emphasis on the severity. So first of all, I feel that Indiana v. Edwards doesn't apply because it didn't exist at the time, but even if this Court would find otherwise, there is no evidence on the record that Mr. Jackson had a long psychiatric history of severe mental illness. I think there was a finding that he suffered from bipolar, but bipolar by itself doesn't mean a severe mental illness. As I think we all know, with proper medications, people can function just fine. And again, you know, we stated that Mr. Jackson was deaf, but that's a physical impairment. That shouldn't be the test of whether he's competent to waive his right to self-represent. I guess the one thing that occurred here is, of course, the judge went through all the steps you're supposed to go through because you want to make sure people really understand how serious it is to represent themselves, although they certainly have a right to do so under the appropriate circumstances. But then when he said, well, he offers up the attorney, Mr. Is it Hammerschmidt? Ginsburg-Hammerschmidt. He keeps asking him, you know, well, are you agreeable to go in with Mr. Hammerschmidt as your attorney and proceeding with him as your attorney, and he keeps saying, yes, that's fine with him. And if, well, if in fact he's competent, as you say, and he can understand the totality of what's going on, how does that square with him basically having listened to everything the judge said, said, okay, I'm going to go that route? Well, I think that he capitulated. I think that that happens to be the case. Are you saying the judge beat him up? Well, what I'm saying is that the judge ascertained that he knew the nature of the charge against him, that he knew, certainly knew the penalty he was looking at because Mr. Jackson himself said he knows he's risking his life, and as you pointed out, the court, you know, explained the complexity and difficulty of a jury trial. He advised him that the prosecutor was an experienced attorney. He also ascertained that Jackson had previously represented himself in a State trial using interpreters, that he participated in jury selection, that he made opening statements, questioned witnesses. He went through everything, and then I guess the case settled before it actually went to verdict, so he didn't have to do jury instructions. And he also told the judge that while he was in prison, he was a paralegal. So I think at that point, the judge should have stopped and made his determination as to whether or not Mr. Jackson validly waived his right to counsel, because he went through and did all of those factors that he was supposed to do. So it's not...   Kagan. So what's your best case for saying that having a continued discussion at that point somehow violates Faretta? Violates? Well, you know, because you're saying, well, the judge went one step too far, in effect. He should have stopped. So I'm trying to understand what case do we look at. Well, what I was looking at let me just turn it a little bit. I felt that the reason that Jackson capitulated was because when the judge kept going, he basically, that he interpreted this as saying, there were two requests. One was to withdraw the guilty plea. The other was to proceed to trial. And I guess tagged on to that was to proceed to trial representing himself. So all of this was taken in the totality. And I think it got to a point, based on some of the things that the judge said, that Mr. Jackson felt that the only way he was going to get a trial was to just give up and go with counsel, because the judge was really making it clear. Now, there was a case in the Ninth Circuit where it specifically says that technical legal knowledge isn't relevant to determining whether a defendant is competent to waive the right to trial. And that's United States v. Arlt, which I think the bench has some familiarity with. Although that was, yes, and also Hirshfield v. Payne. What happened is the judge started focusing so much on the complex justice system, the difficulty in self-representation, he couldn't gauge Jackson's competence. And then he said to Jackson, if you represent yourself at trial, you're not going to get any help. And that raises the issue that I raised in my brief about standby counsel, because he could have still gotten some help. The Court said, if you want to go to trial, can you work with Mr. Hammerschmidt? Well, Mr. Jackson did want to go to trial, and he believed that the Court meant that he had no choice but to go with Mr. Hammerschmidt. He thought that was the only way he could get to withdraw his plea. And so the Court, again, so the Court, it's – I don't want to say the Court was badgering him. I know this judge well, and I know where he was going with this, but I think he certainly wanted to run an efficient courtroom. He didn't want the trial delayed. He wanted to do it. But he was focusing on communication skills. He was focusing on things other than the mental confidence, the knowing and voluntary waiver. He says, you want a trial? We can certainly give you a trial, but I don't believe, given the risks and the consequences you are facing, that it is reasonable or prudent for you to represent yourself. And then he asks the attorney, Mr. Hammerschmidt, to evaluate his relationship with Jackson. And that concerned me because I felt this wasn't a Marsden motion. This wasn't requesting a substitution of counsel, not exactly. He was requesting that he be allowed to represent himself. And, you know, Mr. Hammerschmidt, I mean, he had his issues. I mean, Mr. Jackson is not an easy person to represent. He had gone through a couple of attorneys. The judge recognized this. And so Mr. Hammerschmidt says, well, he'll do his best, but he pointed out previous problems. And the Court says, well, he'd have the same problems if we appointed, you know, three, four, five attorneys. It would be the same. So Mr. Jackson starts to waiver. All of this is going on. And so he kind of acquiesces, well, I need access to the library. You know, kind of he's trying to make a little quid pro quo there. That's what he appeared to want, right, do his own research? Well, he wanted more than his own research. He certainly wanted that. But I think he wanted the chance to get up there and just do it. And so I felt that based on United States v. Arlt, this capitulation doesn't really signify equivocation about self-representation. It's more a matter of, well, I'm defeated. Let me at least get a trial. You know, I'm going to do it his way. But I feel that if the judge had stopped earlier and we talked about the judge beating him up, well, but there was a kind of mental coercion going on, I think. And I feel that that is what happened here. And so Jackson gave in. But then even at the trial confirmation he did, again, raise the right to proceed pro se, so he never gave up that idea. Thank you. Thank you, Judge. Good morning, Your Honors. I'm Deuce Rice. I'm an assistant U.S. attorney in the Eastern District of California. I was the trial prosecutor in this case. During the course of the proceedings, Mr. Jackson, throughout the criminal proceedings, Mr. Jackson held himself out to Judge Wanger as being unable to speak and unable to hear. And I think that, you know, Your Honor, Judge Reinhart put his finger on it. I think it was baloney, to be quite honest. And, in fact, he had given a statement to Detective Owens, and in the court record at 287, I was weighing whether or not to put Detective Owens on the stand to bring out Mr. Jackson's statement to the detective without a sign interpreter about the national bank robbery and the fact that he used a real gun. I decided not to do it because in that same statement he also mentioned that he preferred robbing banks and not a gas station, and I also had that charged, and, in fact, I was killing him anyway. So I elected not to do it. But, anyway, for Judge Wanger, who's a very, very fine district court judge, as far as he could tell throughout the criminal proceedings, Mr. Jackson could not hear and could not speak. And he did it, Judge Wanger, in those circumstances, went through and tried to explain to him all the various things and the risk that he was facing if he were to represent himself. Well, frankly, Mr. Jackson, when this came up, his wanting to represent himself at trial was on a motion to withdraw his guilty plea. I tried to save him. I offered him count two and count six and seven, which were just slam-dunk, at least three witnesses on each bank identifying him, strong photos, excellent case, you know, and he would have been, probably would have got about 15 years. I said he represented himself in some State case before. You know, that's what Mr. Jackson says. I have no information that reflects that. So I don't know if it's true or it's not true, Your Honor. Should the district court have let him represent himself in the point Mr. Hammerschmidt is a standby counsel? I think the court could have. If Judge Wenger did that, I think it would have been fine. But the problem came when Judge Wenger asked him point blank, do you want a lawyer? And as the judge brought out, his response, after he had been advised of all the risk, was yes. And I think at that point, you know, you have the right to counsel in friction or in tension with the right to self-representation. Both of them are equal constitutional rights. And when he was asked point blank, do you want to counsel, he said yes. And I think at that point he made his election, and that was the point I was trying to make in my brief. Well, the only thing that was a little bothersome was the statement that if you do this, you're not going to get any legal help. That, I suppose, he had the discretion. I think it's a discretionary call. Why would he make that call? I don't know. I think it's probably maybe an abuse of discretion. I haven't seen a case on it. I don't believe there's a constitutional right to standby counsel. I'm not aware of any case like that. I think it's totally up to the judge. But in here, we never even got there, because when he was asked whether or not he wanted an attorney, he didn't keep going, no, I want to represent myself. He said, yes, I want one that will help me. And then he gets into, you know, the conversation with Mr. Hammership, Mr. Hammership, can you do it? And he assures the judge that he can. One of the things undoubtedly that influenced him to say that I want an attorney is because he was told that if he didn't, he would get no legal help. It very well could be. You know, I don't know what Judge Wenger was thinking at that point. In fact, I wasn't even in the room. You see, I couldn't figure out if he was saying no legal help or you don't get any help. In other words, what the judges always say is I'm not going to bail you out. So I wasn't sure. I'm not sure either. I wasn't there. You know, and to even try to clarify that point, because I was excluded from the courtroom during that hearing. You know, I think really what it comes down to is that he chose his right to counsel over his right to self-representation in the final analysis. How far – I think the law is, you know, the way the whole colloquy in Hays goes and things like that, the judge is trying to dissuade somebody from representing himself. That's what that whole colloquy is about. You know, Ed bringing out all the dangers. What did he end up with in total sentence? He got life. I think it was like 1,070 months. You know, complete buffoonery, to be honest. You know, he should have taken the deal. Mr. Rainwater, he had a very fine assistant federal defender, Robert Rainwater, I've known for 20 years or more. Very fine defense attorney. And also Jeff Hammerschmidt, former homicide prosecutor in the Fresno County DA's office for many, many years. A very fine attorney also. He got all this time because of this firearm aggravator each time. Correct. That's a big factor. Correct. You know, it was a foolish move on his part, I believe, to roll the dice, you know, with that much time hanging over his head, you know. I tried to save him, but it didn't – you know, there's only so much I can do. Thank you, Ken. You're welcome. It's very hard sometimes going against the attorney who was at the trial because you're disadvantaged. However, based on the record, as I read it, Mr. Rice referred to conversations with Mr. Jackson, and I'm not sure where in the record that is. There might have been some discovery, but that's not what's before the court. This is not a habeas proceeding. And so I think the question of whether Mr. Jackson was physically capable of speaking or not is really not before the court. It's how he held it. It should be looked at as what he represented to the court and what his behavior was. Also, you know, again, it's very nice, you know, Mr. Rice, who I've known for a long time and is an excellent attorney, and I personally think he made a very generous offer, but again, that is beside the point. The point is, was Mr. Jackson competent to make a knowing and voluntary and unequivocal waiver of his right to counsel? And it doesn't matter that Mr. Hammerschmidt was a homicide. Kennedy, he was found to be incompetent or that he was incapable of representing himself. The judge is supposed to fully advise the person who's claiming Veretta right. It's supposed to fully advise him of the consequences and what he faces and the wisdom of doing it. And you're saying that the judge's performance in advising him of those things was a violation. No. No, Your Honor. That's not what I'm saying. And if that's how it's coming across, let me apologize to the Court. I think that the judge did an excellent job of advising him, and he went through, you know, all of them, and then, you know, all of these different hardships and difficulties. Well, did he ever say, I won't allow it? But then he – but then, then at that point, you know, once Mr. Jackson says, I know I'm risking my life, but I want to roll the dice, you know, I want to get it at that – I think at that point it was complete. And I think after that point it became pressure. It crossed the line from advising him to pressuring him. I don't think the judge exceeded his authority or abused his discretion or whatever in pursuing the effort to suggest to Mr. Jackson that it was not a wise idea, that he went too far in saying that. Right. It's not that he said to Mr. Jackson, I find you incompetent of asserting your freedom of rights. Well, that's right. I mean, he never really made a finding. The judge never put on the record what his reason was. He never said, I won't allow you to do it. Well, that's true. I understand that. But I think that I – I interpreted this whole dialogue as just, okay, I've told you, and now I'm telling you again, and I'm telling you again, and at this point Jackson is thinking, I mean, maybe the best thing that could have happened to Mr. Jackson is that the judge didn't allow him to withdraw the guilty plea. I mean, he would be in a much better position than he is today. But for whatever reason, he did not want to stay with that guilty plea. And the judge didn't seem to be reluctant to let him withdraw it, provided he went with counsel. So all of these – they were all melded together. And I think that, you know, the judge, based on his experience and his wisdom, knew that, you know, Mr. Jackson – or believed he knew that Mr. Jackson would be difficult in a trial, just, you know, ruled it out. I mean, I don't think he ever intended to allow him to represent himself. And I think that goes beyond what the cases say and what the Sixth Amendment says. Thank you. Thank you. The case just argued will be submitted. The Court will stand in recess for the day. Thank you.
judges: Reinhardt, Siler (6th Cir.), McKeown, Cjj